# Exhibit C

## FINRA DISPUTE RESOLUTION
## CASE NO. 19-00948

**CHARLES SCHWAB & CO., INC.,**

      **Claimant,**

**v.**

**CHRISTOPHER ARMSTRONG,
RANDALL KIEFNER and MORGAN
STANLEY SMITH BARNEY, LLC,**

      **Respondents.**

---

**CHRISTOPHER ARMSTRONG
and RANDALL KIEFNER,**

      **Cross-Claimants,**

**v.**

**MORGAN STANLEY SMITH BARNEY, LLC,**

      **Cross-Respondent.**

### ARMSTRONG AND KIEFNER'S CROSS-CLAIMS
### AGAINST MORGAN STANLEY SMITH BARNEY

Pursuant to Rule 13303(b), respondents Christopher Armstrong and Randall Kiefner, having answered claimant Charles Schwab & Co., Inc.'s statement of claim, state their cross-claims against respondent Morgan Stanley Smith Barney, LLC ("*MSSB*").

### What This Case Is About

Over the past 25 years the market for serving the investment-management needs of the Baby Boomers and the now aging cohort of Gen Xers that followed them has grown increasingly competitive. The "wirehouse" business model for delivering these services—commission-driven

1

securities brokerage rife with conflicts of interest and governed by a duty of ordinary care—has increasingly shifted to fee-based independent investment advisory practice under a fiduciary standard of care. As Schwab has reported, "While the advisor-managed asset market share in the wirehouse channel declined 10 percentage points over 10 years, the RIA channel increased 5.3 percentage points over the same period." Schwab Advisor Services, *Charting your own course: Discover five business models for the modern RIA* (2018).

Schwab and MSSB, of course, are two of the leading warriors battling for this market. Christopher Armstrong and Randall Kiefner are unwitting casualties in this on-going battle of titans, a financial war reminiscent of the Wars of the Roses. In an excess of zeal in competing against Schwab by any means necessary, MSSB duped Mr. Armstrong and Mr. Kiefner into disclosing Schwab's confidential practice metrics and customer information with a view towards diverting their customers from Schwab. MSSB falsely assured them that Schwab's restrictive covenants were not enforceable. It assured them that their independent duties to their clients superseded the restrictive covenants. MSSB engaged its own lawyer to guide them in their separation from Schwab and ensuing transition to MSSB. To help cement their reliance on these false and misleading assurances, MSSB represented that it was so sure of its assurances that it would cover their costs and attorney's fees in the event of a dispute with Schwab and would indemnify them against the financial burdens of any dispute-resolution proceedings.

Hindsight can be exquisitely clear. With the benefit of 20/15 hindsight, Mr. Armstrong and Mr. Kiefner can now see they were naïve. In its statement of claim, Schwab contends MSSB "motivate[d]" Mr. Armstrong and Mr. Kiefner "to steal" Schwab's confidential information. As to Mr. Armstrong and Mr. Kiefner, the contention is wrong. They never had any intention of taking anything that rightfully belonged to Schwab. Instead, they acted in accordance with what

2

MSSB assured them were entitled to do. They trusted MSSB's false and misleading assurances. They relied on the advice of the attorney MSSB engaged for them—they thought, wrongly as it turns out, that he was *their* lawyer. But for this trickery, Mr. Armstrong and Mr. Kiefner never would have consented to disclosing Schwab's practice metrics and customer information to MSSB. But for MSSB's and their attorney's false and misleading assurances, they never would have agreed to make their resignations from Schwab effective immediately. They never would have agreed to immediately begin calling Schwab's clients to inform them that they had joined MSSB.

MSSB wantonly and recklessly disregarded Mr. Armstrong and Mr. Kiefner's rights and legitimate interests when it enlisted them in its battle against Schwab. When, as MSSB should have expected, Schwab commenced this proceeding to as a remedy against MSSB's wrongful practices, MSSB—and the attorney it hired for them—instantly abandoned them on the battlefield. It dismissed them as disposable casualties of its war with Schwab for market share. It repudiated its false promises and, as Mr. Armstrong protested in a moment of acute distress, "*They hung me out to dry . . . . . im [sic] destroyed.*" Mr. Armstrong and Mr. Kiefner's careers are now ruined. They are ruined. By their cross-claims, they seek to be vindicated for MSSB's grievous wrongs.

### STATEMENT OF CROSS-CLAIMS

As their cross-claims against Morgan Stanley Smith Barney, Mr. Armstrong and Mr. Kiefner state as follows:

## THE PARTIES

**A.      Cross-Claimants.**

1.      Mr. Armstrong, age 55, and his wife Jill reside in Spring Lake Heights, New Jersey. Mrs. Armstrong is an elementary school nurse in Freehold Township, New Jersey. They have four children—a daughter in her second year at Loyola University in Baltimore, a son and daughter in high school and a daughter in middle school.

2.      Between November 2004 and March 2019, Mr. Armstrong was an associated person of Schwab, a member of FINRA, with a post of duty at Red Bank, New Jersey. On March 29, 2019, he resigned and joined counter-respondent Morgan Stanley Smith Barney ("*MSSB*"). On April 11, 2019, MSSB notified him that it had terminated his employment.

3.      Mr. Kiefner, age 56, and his wife Christy reside in Apopka, Florida, near Orlando. Mrs. Kiefner is a stay-at-home mom and part-time caregiver for a neighbor's elderly mother. They have two children, a son who is in his junior year at University of Central Florida and a daughter, who, having graduated from high school, is taking a year off before going to college.

4.      Between March 2008 and March 2019, Mr. Kiefner was an associated person of Schwab, with a post of duty at Orlando, Florida. On March 29, 2019, he resigned his and joined MSSB. On April 11, 2019, MSSB notified him that it had terminated his employment.

5.      As persons formerly associated with MSSB, and under FINRA's restated certificate of incorporation and bylaws and FINRA's Forms U-4 "*Uniform Application for Securities Industry Registration or Transfer*" pursuant to which they were registered as MSSB's representatives, and under FINRA Dispute Resolution's bylaws and code of industry arbitration procedure, Mr. Armstrong and Mr. Kiefner are obligated to submit their cross-claims against MSSB to this forum for arbitration.

**B.      Counter-Respondent Morgan Stanley Smith Barney.**

6.      As a member of FINRA, and under FINRA's restated certificate of incorporation and bylaws and the Forms U-4 "*Uniform Application for Securities Industry Registration or Transfer*" pursuant to which MSSB registered Mr. Armstrong and Mr. Kiefner as its representatives, and under FINRA Dispute Resolution's bylaws and code of industry arbitration procedure, MSSB is obligated to arbitrate the cross-claims in this proceeding.

7.      At all times material to the matters presented for decision in this proceeding, MSSB acted through Christopher Shaw, Steven T. Freeman and Christine Benedict, among others.

8.      Christopher Shaw was Managing Director of MSSB's Southern New Jersey Complex, with a post of duty in Red Bank, New Jersey.

9.      Steven T. Freeman was Executive Director and Complex Manager of MSSB's "Central-North Florida Complex," with a post of duty in Winter Park, Florida.

10.     Christine Benedict was a recruiting manager for MSSB, with a post of duty in New York City.

11.     Michael S. Taaffe, an attorney and partner of a Sarasota, Florida law firm known as Shumaker, Loop & Kendrick, LLP, represented MSSB "in various and significant matters across the nation regarding a variety of subjects" and concurrently represented Mr. Armstrong and Mr. Kiefner in their separation from Schwab and transition to MSSB.

12.     Scott A. La Porta, an attorney and partner of Shumaker, Loop & Kendrick, LLP, represented Mr. Armstrong and Mr. Kiefner in their separation from Schwab and transition to MSSB.

5

## ALLEGATIONS COMMON TO THE CROSS-CLAIMS

A.   **MSSB's History of Recruiting Schwab Advisors as a Means of Misappropriating Schwab's Confidential Information.**

13.   MSSB competes with Schwab and other firms in the marketing, sale, and delivery of securities brokerage and investment advisory services, financial services, and wealth planning services. As of December 31, 2018, MSSB conducted this business through a network of approximately 16,000 financial advisors. MSSB 2018 CONSOLIDATED STATEMENT OF FINANCIAL CONDITION, p. 3.

14.   MSSB's holding company considers all aspects of its affiliates' businesses, including MSSB's retail business, to be "highly competitive" and, as of December 31, 2018, expected them to remain so. Its affiliates, including MSSB, compete in the Unites States market "for clients, market share and human talent." MSSB's "ability to sustain or improve [its] competitive position . . . depends substantially on [its] ability to continue to attract and retain highly qualified employees while managing compensation and other costs." MORGAN STANLEY 2018 FORM 10-K, p. 1.

15.   At all times material to this proceeding, MSSB competed against Schwab and other firms to grow the amounts of customer assets under its management or supervision by pursuing a strategy of recruiting advisors employed by these competitors, with the expectation that the recruited advisor's customers and assets would follow the advisor to MSSB.

16.   At all times material to this proceeding, MSSB required advisors whom it recruited to disclose, among other things, the total of the assets under their management, the percentage of assets managed in fee-based advisory accounts, the "top 10" securities in which the assets under management were held and the percentage of the recruits' trailing 12 revenue from

their "top 10" and "top 25" households. MSSB developed an eight-page form, which it called the "Due Diligence Profile," for the recruits' disclosure of these practice metrics.

17.     Since 2012, Schwab has required its financial consultants and portfolio consultants to enter into a restrictive covenants agreement known as the Confidentiality, Nonsolicitation, and Intellectual Property Ownership Agreement ("*CNIPO Agreement*"). At all times material to this proceeding, MSSB has known the contents of the CNIPO Agreement.

18.     At all times material to this proceeding, MSSB knew that Schwab considered these practice metrics to be statutory trade secrets and confidential under its CNIPO Agreement.

19.     At all times material to this proceeding, MSSB pursued a strategy of competing against Schwab and other firms by inducing advisors whom it recruited to disclose their practice metrics regardless of whether the information was a trade secret or otherwise confidential under the CNIPO Agreement.

20.     On November 2, 2017, in *Charles Schwab & Co., Inc. v. Morgan Stanley Smith Barney, LLC*, FINRA Dispute Resolution No. 16-00705 ("*Quiroz Arbitration*"), MSSB was found to have acted "maliciously and willfully" by "misappropriate[ing] [Schwab's] trade secrets during [its] recruitment, hiring and employment" of a Schwab financial advisor, "Mr. Q". For this misconduct, MSSB was ordered, among other things, to pay Schwab $360,000 in compensatory damages and $600,000 in punitive damages. A copy of the *Quiroz* Arbitration award is attached to Schwab's statement of claim in this proceeding.

21.     The Panel in the *Quiroz* Arbitration found that MSSB required recruits to complete the Due Diligence Profile as a condition of employment. MSSB required Schwab recruits to complete the Due Diligence Profile as a means of obtaining information about the

recruits' clients and assets under management that MSSB knew was confidential information under the terms of the recruits' agreements with Schwab or trade secrets under local law.

**B.     Mr. Armstrong's Decision to Resign from Schwab.**

22.     After graduating from Ohio Wesleyan University in 1985, with a BA in economics Management.  Mr. Armstrong obtained his Series 7 general securities license in 1986. He joined Schwab in 2004 and for the next 15 years served as a financial consultant. In that time he grew his advised practice from $100 million in assets under management to over $425 million.

23.     By 2018, Mr. Armstrong's advised practice was mature. As his clients aged through their retirement years, up to $35 million would leave Schwab annually because of a client's death and for such things as required minimum distributions from retirement accounts, tax distributions and other withdrawals incident to the clients' retirement needs. Schwab required Mr. Armstrong to offset these outflows by bringing up to $60 million in new assets into the company annually to achieve a net inflow of $28 million in new assets. This and pressures stemming from other performance requirements left Mr. Armstrong exhausted, demoralized and depressed.

24.     In connection with Mr. Armstrong's 2018 annual performance review, his manager intimated that he should begin considering alternatives to remaining at Schwab and that, at this point in his career, he might be better suited for a firm with less demanding production requirements.

**C.     MSSB's Inducements to Persuade Mr. Armstrong to Join the Company.**

25.     Mr. Armstrong began considering alternatives and in short order was referred to Christopher Shaw, the manager of MSSB's Southern New Jersey Complex in Red Bank, New Jersey.

26.     Mr. Shaw met with Mr. Armstrong on January 30, 2019. Mr. Armstrong furnished Mr. Shaw with a copy of his CNIPO Agreement. Mr. Shaw told Mr. Armstrong he need not be concerned about the agreement because, in so many words, "it won't hold up and the attorneys can defend against it." He questioned Mr. Armstrong about the size and nature of his advised practice. Among other things, he explained that Mr. Armstrong would need to furnish MSSB with his practice metrics by completing a form that Mr. Armstrong would send and discussed Mr. Kiefner's role in servicing the clients in his advised practice as a Private Client Advisor. Later that morning he emailed Mr. Armstrong a copy of MSSB's blank eight-page Due Diligence Profile for Mr. Armstrong to fill out and return.

27.     Over the course of his long career with the company, from time to time Schwab's web-based human resources portal prompted Mr. Armstrong to electronically sign a new CNIPO Agreement by clicking a box. In doing so, Mr. Armstrong did not read the agreement. The last time he had clicked the box before meeting Mr. Shaw was approximately two years earlier, at the end of 2016. Consequently, when Mr. Shaw told him on January 30, 2019 that before MSSB could consider him for employment he would have to complete the company's detailed Due Diligence Profile, Mr. Armstrong did not perceive anything unusual or amiss about the request.

28.     Mr. Armstrong completed the Due Diligence Profile and returned it to MSSB. In the course of meeting with Mr. Armstrong to discuss his prospects with the company, Mr. Shaw conveyed the company's eagerness to recruit him. When Mr. Armstrong expressed anxiety about

leaving Schwab, Mr. Shaw sought to allay his anxiety by assuring him that MSSB was experienced in these matters and would guide him through the process of transitioning away from Schwab. He explained that notwithstanding Schwab's view to the contrary, an advisor who resigned was entitled to inform his clients that he had resigned and joined a new firm. As an additional inducement, Mr. Shaw assured Mr. Armstrong that MSSB would engage an attorney for him who specialized in advising financial consultants who wanted to break away from Schwab. When Mr. Armstrong expressed his concern about Schwab's reputation for threatening break-away financial consultants, Mr. Shaw represented that MSSB would "protect" him by covering the financial burdens of any legal demands.

29.     Mr. Armstrong was impressed by MSSB's prowess as a first tier, national securities firm. He was impressed by Mr. Shaw's status as a complex manager for southern New Jersey. Consequently, he accepted MSSB's assurances and, over the course of several weeks in February 2019, met with Mr. Shaw and others to learn about MSSB's technology, proposed compensation terms, insurance benefits and other matters incident to becoming employed by the firm.

**D.     MSSB's Inducements to Persuade Mr. Kiefner to Join the Company.**

30.     Mr. Kiefner obtained his Series 7 general securities license in 1990 and worked for various broker-dealers before enrolling at the University of Central Florida where, in 1999, he earned his degree in business administration, with a finance concentration. In 1992, he joined Schwab's call center in Orlando, where he served on an investor-services team. He left Schwab in 2004 for a stint with E*Trade Financial in Georgia, before returning to Schwab in 2008 as Private Client Advisor. In his role as Private Client Advisor, Mr. Kiefner assisted Mr. Armstrong with servicing the assets in his advised practice.

31.     After Mr. Armstrong informed Mr. Kiefner about the assurances Mr. Shaw had given him, Mr. Kiefner expressed a willingness to consider leaving Schwab in conjunction with Mr. Armstrong's resignation. On February 13, 2019, Mr. Armstrong emailed Mr. Kiefner a blank copy of MSSB's Due Diligence Profile.

32.     By February 28, 2019, Steven Freeman, the Florida complex manager, confirmed with Mr. Kiefner that he would tour MSSB's Winter Park branch office the next day, March 1, and meet with his assistant manager, Elizabeth Cambareri.

33.     On March 5, 2019, Mr. Armstrong and Mr. Shaw met at breakfast to discuss Mr. Armstrong's decision to join MSSB. Mr. Armstrong informed him that in an effort to salvage his employment prospects at Schwab, from time to time he had printed Client Central pages, which he used to review accounts for sales opportunities at Schwab. He explained that he still had a number of the documents. When he asked Mr. Shaw if he, Mr. Armstrong, could use the papers in aid of the telephone calls to clients to announce his resignation and inform them that he had joined MSSB, Mr. Shaw responded, in so many words, "No problem." Later that day Mr. Shaw emailed Mr. Armstrong with a memorandum of understanding of the terms of MSSB's compensation terms.

34.     Two days later, on March 7, Mr. Freeman met with Mr. Kiefner over dinner. He touted the opportunities of joining Mr. Armstrong at MSSB, including the promise of being able to focus on delivering investment advice to clients without being inordinately pressured to sell financial products. He represented that MSSB would arrange for an attorney to represent him. He described the attorney as highly experienced in handling disputes with Schwab, characterized the chances of Schwab disputing the transition as "likely, but assured Mr. Kiefner, in so many words, that MSSB "had defenses" and would "cover everything". Additionally, Mr. Freeman attempted

to explain how MSSB would compensate Mr. Kiefner by diagramming the compensation methodology in a small notebook. Mr. Kiefner did not understand the explanation; and when he expressed his confusion, Mr. Freeman promised to send him a description of the compensation arrangement in writing. These representations, assurances and promises satisfied Mr. Kiefner. In reliance on them, he conveyed to Mr. Freeman that he was willing to follow Mr. Armstrong to MSSB. Despite Mr. Freeman's promise to send Mr. Kiefner a written explanation of how he would be compensated, but he never did.

**E.      MSSB's Referral of Mr. Armstrong and Mr. Kiefner to Michael Taaffe, Esq. and Concealment of the Fact that Mr. Taaffe and His Firm Had Long Represented MSSB Nationwide in a Great Number of Matters.**

35.      On March 12, 2019, Mr. Freeman emailed Mr. Shaw and Mr. Kiefner, notifying them that he had scheduled a March 14 teleconference to introduce Mr. Kiefner to Michael S. Taaffe. Mr. Freeman had represented to Mr. Kiefner that Mr. Taaffe was a Florida attorney who specialized in financial advisor transitions and that MSSB would engage to represent Mr. Armstrong and him in their transition from Schwab to MSSB. Mr. Freeman's email identified Mr. Taaffe to Mr. Kiefner as "Outside Counsel". Mr. Kiefner forwarded the email to Mr. Armstrong so he would be included in the call.

36.      Concurrently with scheduling the introduction to Mr. Taaffe, Mr. Freeman emailed Mr. Kiefner "Per my text today" and directed him to "complete section one on the DDP [Due Diligence Profile] and initial next to each response, as well as sign and date the bottom and re-attach to the record." That same day, March 12, Mr. Kiefner complied with Mr. Freeman's direction by initialing page 1 of the eight-page Due Diligence Profile (Section 1) and signing page 8.

37.     The next day, March 13, Mr. Freeman notified Mr. Armstrong of the teleconference with Mr. Taaffe and furnished him with a telephone number and passcode to use for participating in the call. The subject line of the notification identified Mr. Taaffe as "Outside Counsel".

38.     On March 14, 2019, Mr. Freeman introduced Mr. Armstrong and Mr. Kiefner to Mr. Taaffe. In the course of the teleconference Mr. Taaffe represented he had more than 20 years of experience successfully transitioning advisors away from Schwab and other firms and had long defended break-away advisors in litigation and arbitration. He explained he was familiar with Schwab's CNIPO Agreement, having defended advisors against it, and that while the resignation, customer contact and non-solicitation terms of the agreement were aggressively worded, the terms were not fully enforceable. He assured Mr. Armstrong and Mr. Kiefner that he had successfully defended many advisors against Schwab's attempt to enforce the terms.

39.     Mr. Taaffe explained that as a certified financial planner, Mr. Kiefner's fiduciary duty to the clients in his advised practice would require him to notify the clients that he had resigned from Schwab and had joined MSSB. He explained further that this fiduciary duty and FINRA's rules superseded anything in Schwab's CNIPO Agreement.

40.     Mr. Taaffe explained further that while Schwab was notorious for threatening to "go after" advisors as a means of intimidating them and dissuading them from breaking away, its practice when it actually asserted claims was to settle "out of court". Mr. Shaw and Mr. Freeman had earlier represented that MSSB would pay Mr. Taaffe's costs and attorney's fees in their behalf and would cover any financial demands stemming from defending against Schwab. Consequently, Mr. Armstrong and Mr. Kiefner were especially reassured by Mr. Taaffe's representations and, as it appeared to them, his confidence and certainty.

41.     After the teleconference ended, Mr. Freeman texted Mr. Kiefner, expressing his satisfaction with the "good call today for the team." He touted Mr. Taaffe's qualities, stating that "Michael is great and helped me with my transition many years ago. You and Chris are in great hands." As a measure of Mr. Kiefner's confidence in Mr. Taaffe, he responded to Mr. Freeman's text: "I feel more confident with Michael's vast experience in this area, Steve. Very good call!"

42.     Relying on Mr. Taaffe's representations and apparent stature as an attorney with "vast experience in this area," Mr. Armstrong and Mr. Kiefner were happy to accept Mr. Taafe as their attorney. Neither Mr. Armstrong nor Mr. Kiefner, however, knew that Mr. Taaffe was MSSB's lawyer. They assumed that, as their attorney, his loyalty would be to them and only them. But Mr. Taaffe and other members of his firm Shumaker, Loop & Kendrick, LLP had long represented MSSB. In fact, Mr. Taaffe and his firm represented MSSB throughout the United States "in various and significant matters . . . regarding a variety of subjects". Had Mr. Armstrong and Mr. Kiefner known of Mr. Taaffe's concurrent representation of MSSB, and his long history representing the firm, they would have sought advice from an independent lawyer qualified to advise in such matters.

43.     But they did not know of Mr. Taaffe's concurrent representation of MSSB. Consequently, when he informed them his office would furnish them with a form of the letters they would use to notify Schwab of their resignation, they were happy to proceed. In like fashion, when he instructed them to use an internet resource like White Pages.com to compile a list of the clients in their advised practice and their contact information, Mr. Armstrong and Mr. Kiefner did not question his instruction.

44.     Shortly after the teleconference ended, an associate attorney in Mr. Taaffe's office emailed Mr. Armstrong to schedule "another call with you next week to continue our discussion

of your transition strategy". Later that day, March 14, Mr. Taaffe scheduled the call for March 20 and emailed Mr. Armstrong and Mr. Kiefner with his teleconference number and passcode.

45.     In the meantime, Mr. Freeman arranged for Mr. Kiefner to return to MSSB's Winter Park office on March 18, 2019 to view the office he would occupy and meet various staff members.

46.     A few days, on March 21 Mr. Freeman texted Mr. Kiefner, asking him to "initial" the rest of "Chris's due diligence forms" because Mr. Kiefner had initialed only the first page of the form. He arranged to meet with Mr. Kiefner so that he could obtain Mr. Kiefner's initials on the rest of the Due Diligence Profile that Mr. Armstrong had completed.

47.     On March 25, 2019, Mr. Taaffe's paralegal emailed Mr. Armstrong and Mr. Kiefner, enclosing copies of "all documents related to your upcoming transitions, including draft resignation letters." The documents included scripts explaining how to speak with clients and templates for declarations to be signed by clients.

48.     Mr. Armstrong and Mr. Kiefner settled on March 29 as their resignation date. This was the last business day of the week and the last business day of the first calendar quarter.

49.     By email on March 26, Mr. Taaffe scheduled a follow-up teleconference with them for March 27 and furnished them with his teleconference number and passcode. They understood that the purpose of the call was to walk them through the resignation process.

50.     During the March 27 teleconference, Mr. Taaffe explained how Mr. Armstrong and Mr. Kiefner should tender their resignations. Although Schwab's CNIPO Agreement states that an employee must give the company 28-days advance notice of resignation in a writing hand-delivered to the employee's manager, Mr. Taaffe advised Mr. Armstrong and Mr. Kiefner that resignation without notice was "standard" and they could lawfully resign immediately by

emailing their resignation notices to their managers. He explained further how they should proceed with calling clients to announce their resignation and transition to MSSB. He explained how to follow a script he had prepared for their conversations with the clients.

**F.    Mr. Armstrong and Mr. Kiefner's Resignation on March 29, 2019.**

51.    On March 29, 2019, Mr. Freeman texted his encouragement to Mr. Kiefner, anticipating that they would see each other "later today" and concluding, "You guys are going to do great".

52.    In the mid-afternoon of March 29, Mr. Armstrong and Mr. Kiefner resigned from Schwab by emailing their respective managers the letters that Mr. Taaffe had prepared for announcing their resignation. Both letters notified Schwab that Mr. Taaffe was their attorney, instructed Schwab to consider the resignation letters as their "demand for arbitration" and directed Schwab to contact Mr. Taaffe with respect to "any issues regarding [our] departure".

**G.    Pursuant to MSSB's Direction, Mr. Armstrong and Mr. Kiefner Began Informing Their Former Clients at Schwab that They Had Moved to MSSB.**

53.    Acting on Mr. Taaffe's advice and direction, Mr. Armstrong and Mr. Kiefner made their resignation effectively immediately. That same afternoon, pursuant to Mr. Shaw and Mr. Freeman direction, and pursuant to Mr. Taaffe's advice, they began calling their former clients to inform them they had resigned from Schwab and joined MSSB. In their conversations about Schwab's restrictive covenants, Mr. Shaw, Mr. Freeman and Mr. Taaffe had focused on their right to use resources publicly available through the internet to compile lists of their clients and call the clients. Mr. Taaffe explained that his "telephone scripts" would explain how to conduct and guide the conversations.

54.    When it occurred to Mr. Kiefner that the in-coming calls might appear on the clients' telephones as "Morgan Stanley," he asked MSSB if he could to use his personal

telephone to make the calls. Based on MSSB's false and misleading representations and Mr. Taaffe's advice, he believed he was acting properly and as the law permitted by making the calls but, as a newly minted employee of MSSB, he wanted the company's consent to using his cell phone to announce his new position to the customers.

55.     By 4:00 p.m. that day, Mr. Freeman checked with Mr. Kiefner, who informed him that he had already called five clients and made contact with two of them. When Mr. Kiefner informed him that the clients were surprised, Mr. Freeman encouraged Mr. Kiefner to proceed, answering "That's ok. Value proposition [with MSSB] is far greater than CS [Charles Schwab]." Mr. Freeman checked in with Mr. Kiefner again late in the evening of March 29, at approximately 10:00 p.m., asking him "How did it end up?" Mr. Kiefner responded, "Just left the office. . . . Still too many clients we [did] not get to". Once again, Mr. Freeman encouraged Mr. Kiefner to proceed with the calls: "That's ok mate. Good job! Tomorrow will be great". Mr. Freeman's enthusiasm was consistent with his and Mr. Taaffe's assurances that Mr. Kiefner was permitted to call the clients notwithstanding Schwab's CNIPO Agreement.

56.     In like fashion, Mr. Shaw stayed in touch with Mr. Armstrong through the evening of March 29 and the following day, Saturday, March 30, urging him to continue notifying clients that he had joined MSSB. As Friday evening drew to a close, Mr. Armstrong thanked Mr. Shaw for his "trust and the opportunity," to which Mr. Shaw responded, "Great work!!" and "It's a pleasure to have you both on our team."

57.     Mr. Armstrong and Mr. Kiefner continued with calling clients through the weekend, March 30 and 31. Mr. Freeman visited with Mr. Kiefner over the weekend and urged him to keep going. MSSB urged Mr. Armstrong and Mr. Kiefner to contact as many clients as

they could over the weekend because it expected Schwab to seek a temporary restraining order as soon as Monday, April 1.

58.    When Monday, April 1 ended without any notice of litigation, Mr. Freeman congratulated Mr. Kiefner, told him he was free to continue calling clients and reaffirmed that MSSB had his "back on the legal stuff, so don't worry about that. Just focus on calling clients." Mr. Shaw gave the same instruction to Mr. Armstrong, telling him to keeping call clients until he was instructed to stop.

59.    Over the next three days (Tuesday – Thursday), Mr. Armstrong and Mr. Kiefner used Schwab Client Central copies and a client spreadsheet to organize and conduct the client calls. Believing their use of these materials was permitted, they used the documents in their respective MSSB branch office openly and in the presence of office staff and without objection. Meanwhile, Mr. Shaw and Mr. Freeman spurred them on. Little did Mr. Armstrong and Mr. Kiefner imagine that the company was leading them into disaster.

**H.    Schwab's Commencement of Injunctive Relief Proceedings and MSSB's Termination of Mr. Armstrong and Mr. Kiefner's Employment.**

60.    On Friday, April 5, 2019, Schwab sued Mr. Armstrong and Mr. Kiefner in federal district court and filed its statement of claim in this FINRA proceeding. With its district court complaint, Schwab sought to enjoin Mr. Armstrong and Mr. Kiefner's client calls.

61.    Later in the day of April 5, Mr. Kiefner learned of the suit when Mr. Freeman called him into his office. Mr. Freeman called Mr. Taaffe, who explained that he had learned of the suit when a news service reported it. Mr. Taaffe expressed frustration that Schwab had filed suit without first communicating with him. He then sharply questioned Mr. Kiefner, asking him if he had any "Schwab printouts". Mr. Kiefner was intimidated by Mr. Taaffe's demanding tone

18

and surprised by Mr. Taaffe's sudden apparent aversion to Mr. Kiefner having the documents. At Mr. Taaffe's request, Mr. Kiefner mailed the spreadsheet to Mr. Taaffe. By this time, the Winter Park branch office staff had already parceled out the Client Central printouts to MSSB file folders for the clients. Consequently, Mr. Kiefner was not able to send these documents to Mr. Taaffe.

62.     Meanwhile, Mr. Shaw asked Mr. Armstrong to come into his office. When he appeared in his office, Mr. Shaw announced they needed to speak with Mr. Taaffe and called him. In this moment, Mr. Armstrong learned that Schwab had filed suit. Mr. Armstrong perceived that Mr. Taaffe was "miffed" that Schwab had gone to court without notifying Mr. Taaffe. Mr. Taaffe informed him of Mr. Kiefner's spreadsheet and asked if Mr. Armstrong likewise had a spreadsheet. Mr. Armstrong informed Mr. Shaw and him that he did not. Mr. Shaw and Mr. Taaffe instructed Mr. Armstrong that since the district court had not entered a temporary restraining order, he should continue calling clients through the weekend (April 6-7) and assured Mr. Armstrong, in so many words, that they would "take care of this".

63.     That same day, April 5, Mr. Taaffe and his law partner, Michael V. Colvin, entered their appearances in the district court action as Mr. Armstrong and Mr. Kiefner's counsel. At the end of the day, Mr. Freeman spoke again with Mr. Kiefner, and directed him to continue calling clients over the weekend. Noting that a temporary restraining order has not been entered, Mr. Freeman reiterated that Mr. Kiefner did not need to worry about "the legal stuff" and urged him to "just focus on the relationships."

64.     On April 11, 2019, MSSB terminated Mr. Armstrong and Mr. Kiefner and peremptorily escorted them from the company's premises.

65.     The next day, April 12, the district court entered its Limited Temporary Restraining Order and Mr. Taaffe and his law firm moved the court for leave to withdraw as Mr. Armstrong and Mr. Kiefner's counsel, citing MSSB's termination of their employment the day before and his firm's representation of MSSB "in various and significant matters across the nation regarding a variety of subjects".

66.     This development devastated Mr. Armstrong and Mr. Kiefner. They felt, and continue to feel, betrayed by MSSB, Mr. Taaffe and his law firm. One of Mr. Armstrong's new colleagues at MSSB in Red Bank expressed his sorrow for his misfortune:

> "Chris. It's Craig. I just spoke with Shaw. I am so so sorry. I'm shocked. I don't have words to express to you. Please let me know if there is anything I can do to help you. I really enjoyed just getting to know you and helping you in this transition. I feel horrible."

In a demonstration of his great distress, Mr. Armstrong responded, "They hung me out to dry . . . . . im [sic] destroyed".

67.     On April 17, 2019, Mr. Taaffe moved FINRA's director of arbitration for leave to withdraw as Mr. Armstrong and Mr. Kiefner's counsel in this proceeding citing, once again, his "firm's various and significant representation of Morgan Stanley".

68.     In the course of guiding Mr. Armstrong and Mr. Kiefner through their separation from Schwab and transition to MSSB, Mr. Taaffe and MSSB never informed them of this concurrent representation. Mr. Taaffe and his firm never presented Mr. Armstrong or Mr. Kiefner with an engagement letter or any other writing memorializing the terms of his representation or disclosing any potential conflicts of interest. As of today Mr. Taaffe and his law firm have not furnished Mr. Armstrong or Mr. Kiefner with any timekeeping or billing record of the firm's services performed in their behalf.

## I.     Mr. Armstrong and Mr. Kiefner's New Counsel.

69.     On April 19, 2019, Mr. Armstrong and Mr. Kiefner's counsel of record (Clinton W. Marrs, Esq.) entered his appearance in this arbitration proceeding. Mr. Marrs has extensive experience counseling financial advisors in the course of breaking away from their firm, whether to go independent or to join another firm. Since 2007, Mr. Marrs has defended advisors throughout the United States against Schwab's claims for injunctive and other relief.

70.     On April 19, as a means of resolving the federal district court action in an economical, mutually-satisfactory manner, Mr. Armstrong and Mr. Kiefner stipulated to the court's entry of a permanent injunction, thereby allowing them to concentrate their limited financial resources on seeking a remedy for MSSB's betrayal.

## J.     MSSB's Defamatory Form U-5.

71.     On May 1, 2019, MSSB terminated Mr. Armstrong and Mr. Kiefner's registration with FINRA by filing its Forms U-5 with FINRA. As grounds for the termination of their registration, MSSB purported to explain:

> "Failure to meet the Firm's expectations regarding professional conduct and adherence to the Firm's policy governing the transition of Financial Advisors to Morgan Stanley."

72.     In view of MSSB's conduct as alleged herein, the explanation is false and misleading, both in the falsity of its express statements and in its omission of facts material to the truth of the explanation.

### CROSS-CLAIMS FOR RELIEF

As their cross-claims against MSSB, Mr. Armstrong and Mr. Kiefner state in the alternative as follow:

**First Cross-Claim**
*[Tortious Interference with an
Actual Business Relationship and Contract]*

73.     Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

74.     MSSB tortiously interfered with Mr. Armstrong and Mr. Kiefner's actual business relations and contracts by engaging in the inducements, making the assurances and engaging in other conduct as alleged herein.

75.     These inducements and assurances included promises of a guaranteed base salary, an immediate forgivable loan and future additional performance-based forgivable loans.

76.     These inducements and assurances included MSSB's offer to pay the cost of Mr. Armstrong and Mr. Kiefner's defense and to indemnify them if Schwab sued them or asserted claims against them in arbitration. As an additional material inducement, MSSB referred Mr. Armstrong and Mr. Kiefner to Shumaker, Loop and Kendrick, LLP and its principal, Mr. Taaffe for advice and direction in separating from Schwab and transitioning to MSSB, with the promise that it would pay the expenses of the representation. Mr. Armstrong and Mr. Kiefner accepted these offers.

77.     Mr. Armstrong and Mr. Kiefner's interest in their careers as financial consultants, both as to their interests in their contracts of employment with Schwab and their reasonable expectations of prospective economic advantage, including their continuing employment in the financial services industry, transition away from Schwab consistently with their post-employment obligations to Schwab and their business reputations, are protectable interests.

78.     MSSB intentionally interfered with these interests without justification. MSSB's interference caused the destruction of Mr. Armstrong and Mr. Kiefner's book of business and

caused them to suffer the loss of their contracts of employment and the actual and prospective gains that otherwise would have accrued to them, as a result of which Mr. Armstrong and Mr. Kiefner were damaged.

79.     MSSB knew or should have known that Mr. Armstrong and Mr. Kiefner worked closely with their clients at Schwab in one-on-one relationships and that these clients placed great trust in them and relied on them for advice and guidance.

80.     By causing the destruction of Mr. Armstrong and Mr. Kiefner's book of business, MSSB harmed their clients by destroying their interest in the uninterrupted enjoyment of the Mr. Armstrong and Mr. Kiefner's guidance and advice.

81.     MSSB committed this tortious interference as a means by which it sought unlawfully to compete with Schwab. It duped Mr. Armstrong and Mr. Kiefner and interfered with the clients' interests pursuant to its pattern and practice of poaching its competitors' financial consultants by inducing them with false assurances, promises of protection and valuable remuneration to resign, join MSSB and deliver the competitors' confidential practice metrics, client lists and other information to MSSB.

82.     The damages Schwab seeks against Mr. Armstrong and Mr. Kiefner were caused by MSSB. MSSB is primarily liable to Schwab for these damages.

83.     MSSB's breach proximately caused Mr. Armstrong and Mr. Kiefner to suffer actual and special damages (including amounts, if any, they must pay Schwab) in amounts to be proven at arbitration.

84.     MSSB acted willfully, recklessly or in wanton disregard of Mr. Armstrong and Mr. Kiefner's rights in acting and failing to act as alleged herein. MSSB is liable to Mr. Armstrong and Mr. Kiefner for punitive damages in an amount to be determined at arbitration.

85.     MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

**Second Cross-Claim**
*[Tortious Interference with a Prospective*
*Business Relationship and Contract]*

86.     Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

87.     MSSB tortiously interfered with Mr. Armstrong and Mr. Kiefner's prospective business relations and contracts by engaging in the conduct alleged herein

88.     By its inducements, assurances and other conduct as alleged herein, MSSB created in Mr. Armstrong and Mr. Kiefner a reasonable expectation of economic benefit or advantage. Having created the expectancy, MSSB knew of the expectancy.

89.     MSSB intentionally interfered with the expectancy.

90.     But for MSSB and Mr. Taaffe's wrongful inducements and advice, Mr. Armstrong and Mr. Kiefner would have realized the expectancy by resigning from Schwab and transitioning to MSSB without breaching or threatening to breach any of their post-employment obligations to Schwab under the CNIPO Agreement. Absent MSSB's interference, Mr. Armstrong and Mr. Kiefner would have received the expected economic benefit to a reasonable probability.

91.     MSSB's breach proximately caused Mr. Armstrong and Mr. Kiefner to suffer actual and special damages (including amounts, if any, they must pay Schwab) in amounts to be proven at arbitration.

92.     MSSB acted willfully, recklessly or in wanton disregard of Mr. Armstrong and Mr. Kiefner's rights in acting and failing to act as alleged herein. MSSB is liable to Mr. Armstrong and Mr. Kiefner for punitive damages in an amount to be determined at arbitration.

93.     MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

### Third Cross-Claim
### *[Breach of Contract]*

94.     Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

95.     Mr. Armstrong and Mr. Kiefner accepted MSSB's offer to pay the cost of their defense and to indemnify them if Schwab sued them or asserted claims against them in arbitration.

96.     In separating from Schwab and transitioning to MSSB, Mr. Armstrong and Mr. Kiefner conducted themselves in accordance with MSSB's and Mr. Taaffe's express and implied advice and guidance.

97.     MSSB breached its agreement to engage an attorney in their behalf to defend them against Schwab's federal district court claims and FINRA arbitration claims by failing to engage an attorney for them in the wake of Mr. Taaffe's withdrawal as their attorney. By its breach, it repudiated its promise to indemnify them.

98.     MSSB's breach proximately caused Mr. Armstrong and Mr. Kiefner to suffer actual and special damages (including amounts, if any, they must pay Schwab) in amounts to be proven at arbitration.

99.     MSSB acted willfully, recklessly or in wanton disregard of Mr. Armstrong and Mr. Kiefner's rights in acting and failing to act as alleged herein. MSSB is liable to Mr. Armstrong and Mr. Kiefner for punitive damages in an amount to be determined at arbitration.

100.     MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

### Fourth Cross-Claim
*[Breach of Covenant of Good Faith & Fair Dealing]*

101.     Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

102.     Every contract in New Jersey and Florida contains an implied covenant of good faith and fair dealing.

103.     By its conduct as alleged herein, MSSB breached its implied covenant to deal fairly with Mr. Armstrong and Mr. Kiefner and in good faith.

104.     MSSB's breach proximately caused Mr. Armstrong and Mr. Kiefner to suffer actual and special damages (including amounts, if any, they must pay Schwab) in amounts to be proven at arbitration.

105.     MSSB acted willfully, recklessly or in wanton disregard of Mr. Armstrong and Mr. Kiefner's rights in acting and failing to act as alleged herein. MSSB is liable to Mr. Armstrong and Mr. Kiefner for punitive damages in an amount to be determined at arbitration.

106.     MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

**Fifth Cross-Claim**
*[Promissory Estoppel]*

107.    Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

108.    MSSB clearly and definitely promised Mr. Armstrong and Mr. Kiefner that it would pay the costs and attorney's fees incurred by an attorney acting in their behalf and would cover any financial demands stemming from defending against Schwab with the expectation that they would rely on the promise in accepting MSSB's offer to employ them. Mr. Armstrong and Mr. Kiefner reasonably relied on the promise, to their definite and substantial detriment.

109.    MSSB is liable to Mr. Armstrong and Mr. Kiefner under the doctrine of promissory estoppel.

110.    MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

**Sixth Cross-Claim**
*[Contribution and Indemnity]*

111.    Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

112.    MSSB is liable to Mr. Armstrong and Mr. Kiefner for all or part of Schwab's claims asserted in the action against them.

113.    Mr. Armstrong and Mr. Kiefner are entitled to contribution from MSSB and to be indemnified by MSSB against any amounts payable by them to Schwab.

114.    MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

### Seventh Cross-Claim
### *[Civil Conspiracy]*

115.    Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

116.    By the conduct alleged herein, MSSB and its agents, including Mr. Taaffe, combined to act in concert to induce Mr. Armstrong and Mr. Kiefner to act as they did as a means by which MSSB unlawfully competed with Schwab and engaged in overt acts in furtherance of the combination that caused Mr. Armstrong and Mr. Kiefner to suffer actual and special damages (including any amounts, if any, they must pay Schwab) in amounts to be proven at arbitration.

117.    MSSB acted willfully, recklessly or in wanton disregard of Mr. Armstrong and Mr. Kiefner's rights in acting and failing to act as alleged herein. MSSB is liable to Mr. Armstrong and Mr. Kiefner for punitive damages in an amount to be determined at arbitration.

118.    MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

### Eighth Cross-Claim
### *[Defamation]*

119.    Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

120.    The explanation stated in MSSB's Forms U-5 for Mr. Armstrong and Mr. Kiefner, and its publication of the explanation, is defamation.

121.    Defamatory statements in a Form U-5 are actionable, subject only to a qualified privilege. MSSB published the defamatory explanation without a privilege to do so because it acted with malice.

122.    By filing the false and defamatory Forms U5, MSSB impaired Mr. Armstrong and Mr. Kiefner's ability to find competitive employment in the financial services industry, thereby enabling MSSB to service their clients free from any competition by Mr. Armstrong and Mr. Kiefner.

123.    MSSB's defamation caused Mr. Armstrong and Mr. Kiefner to suffer actual and special damages (including any amounts, if any, they must pay Schwab) in amounts to be proven at arbitration.

124.    MSSB acted willfully, recklessly or in wanton disregard of Mr. Armstrong and Mr. Kiefner's rights in acting and failing to act as alleged herein. MSSB is liable to Mr. Armstrong and Mr. Kiefner for punitive damages in an amount to be determined at arbitration.

125.    MSSB is liable to Mr. Armstrong and Mr. Kiefner for all the costs, attorney's fees, expert fees, and other costs of this proceeding, including their expert fees and costs, which, but for MSSB's wrongful conduct, they would not have had to pay.

### Ninth Cross-Claim
*[Expungement of MSSB's Form U-5]*

126.    Mr. Armstrong and Mr. Kiefner incorporate by reference the preceding allegations as though set forth fully herein.

127.    A panel of arbitrators in a FINRA industry case is authorized by FINRA's rules and custom of practice to order expungement of the reason for a registered representative's

termination reported by his former firm if the information is defamatory, misleading, inaccurate, or erroneous.

128. Rule 2080 and the procedural requirements under Rules 12805 and 13805 govern requests for expungement of customer-dispute information. If the discharged employee's expungement request in an industry arbitration does not involve customer dispute information, Rule 2080 and the procedural requirements under Rules 12805 and 13805 do not apply to the request.

129. Under FINRA's rules and custom of practice, if the arbitrators recommend expungement of non-customer dispute information and also determine that the information is defamatory in nature, FINRA will expunge the information without a court order.

130. If the arbitrators are satisfied that the non-customer dispute information is defamatory in nature, they must clearly state in the award that they are recommending expungement based on the defamatory nature of the information in the CRD system. Arbitrators, however, are not required to find or to state explicitly in the award that all elements required to satisfy a claim in defamation under governing law have been met.

131. MSSB's statement in its Forms U-5 that it discharged Mr. Armstrong and Mr. Kiefner because they "[f]ail[ed] to meet the Firm's expectations regarding professional conduct and adherence to the Firm's policy governing the transition of Financial Advisors to Morgan Stanley" is misleading, inaccurate, or erroneous.

132. MSSB's statement is defamatory.

133. MSSB's statement is eligible for expungement and should be expunged.

## PRAYERS FOR RELIEF

Mr. Armstrong and Mr. Kiefner ask the panel to enter an award in their favor and jointly and severally against MSSB granting them the following relief:

A.    *compensatory* damages in a principal amount to be proven at the arbitration hearing on the merits, including any amounts payable by them to Schwab on account of MSSB's wrongs;

B.    *special* damages in a principal amount to be proven at the arbitration hearing on the merits, including any amounts payable by them to Schwab on account of MSSB's wrongs;

C.    *punitive* damages in a principal amount to be proven at the arbitration hearing on the merits;

D.    reimbursement of their *costs*, including the filing and forum fees in this proceeding, to the fullest extent permitted by law, including any amounts payable by them on account of MSSB's wrongs;

E.    reimbursement of their *attorney's fees* in this proceeding to the fullest extent permitted by law, including any amounts payable by them on account of MSSB's wrongs;

F.    payment of post-award *interest* on the total principal amount of the award at a rate equal to at least maximum rate of interest allowed by law from the date of award until the award is paid in full;

G.    *expungement* of the defamatory, misleading, inaccurate, or erroneous information reported by MSSB's Forms U-5; and

31

H. such other and further relief as the panel deems just and proper.

  Sincerely,

  **MARRS GRIEBEL LAW, LTD**


  By: */s/ Clinton W. Marrs*
    Clinton W. Marrs


CERTIFICATE OF SERVICE

 I certify that on the 14th day of June, 2019, an authentic copy of the foregoing paper was uploaded to the FINRA DR Portal, causing same to be served via the FINRA DR Portal upon the following, and an authentic copy was sent by email to counsel at the addresses below:

Michael R. Greco
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, CO 80202
Tel:  (303) 218-3650
mgreco@fisherphillips.com
*Attorneys for Claimant*

Joseph E. Gehring, Jr.
Gehring & Satriale, LLC
370 Lexington Avenue, Ste. 1200
New York, NY 10017
Tel:  (212) 400-7420
jgehring@GTSLaw.com
*Attorneys for Respondent*
*Morgan Stanley Smith Barney*


  */s/ Clinton W. Marrs*
Clinton W. Marrs